UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CONSTANCE E. SHOLL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:22-cv-00042-SLC |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Constance E. Sholl appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (ECF 1). Because at least one of Sholl's two arguments is persuasive, the Commissioner's final decision will be REVERSED and REMANDED to the Commissioner for further proceedings.

### I. FACTUAL AND PROCEDURAL HISTORY

Sholl applied for DIB in December 2019, alleging disability since October 30, 2018. (ECF 6 Administrative Record ("AR") 10, 190). Sholl's claim was denied initially and upon reconsideration. (AR 10, 57-84). On June 22, 2021, administrative law judge ("ALJ") Kathleen Winters held an administrative hearing at which Sholl—who was accompanied by her representative Tara Budd[1]—and a vocational expert ("VE") testified. (AR 10, 32-56). On July 22, 2021, the ALJ rendered an unfavorable decision to Sholl, concluding that she was not disabled because she could perform a significant number of jobs in the national economy. (AR

---

[1] Budd is associated with Sholl's primary representative during the administrative proceedings, Attorney Randall Forbes of Forbes Disability Group, LLC, who also represents her in this litigation. (*See* AR 10, 85; ECF 3).

10-20). The Appeals Council denied Sholl's request for review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

Sholl filed a complaint with this Court on February 4, 2022, seeking relief from the Commissioner's decision. (ECF 1). In her appeal, Sholl alleges that: (1) the ALJ failed to carry the Commissioner's burden to cite a significant number of jobs at step five; and (2) the ALJ failed to adequately account for Sholl's upper extremity reaching, handling, fingering, and feeling limitations when assigning residual functional capacity ("RFC"). (ECF 20 at 2).

At the time of the ALJ's decision, Sholl was forty-nine years old (AR 190); had a high school education (AR 213); and had past relevant work experience as a press operator, rolling machine operator, and school bus driver (AR 18; *see* AR 213). When filing her DIB application, Sholl alleged disability due to shoulder weakness and "damage," carpel tunnel syndrome, and allergies. (AR 212).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the [ALJ] applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative

2

record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking DIB must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4) whether she is incapable of performing her past relevant work, and (5) whether she is incapable of performing

any work in the national economy.² *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520. "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

*B. The Commissioner's Final Decision*

On July 22, 2021, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 10-20). The ALJ found at step one that Sholl had not engaged in substantial gainful activity after her alleged onset date of October 30, 2018. (AR 12). At step two, the ALJ determined Sholl had the following severe impairments: surgical repair of the left rotator cuff with osteoarthritis of the acromioclavicular joint, and minimal spondylosis of the cervical spine but chronic C5-6 radiculopathy. (*Id.*). At step three, the ALJ concluded that Sholl did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 13).

The ALJ then assigned Sholl the following RFC:

[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except she can never crawl, or climb ladders, ropes, or scaffolds; she can occasionally reach in all directions with the left, non-dominant, upper extremity. Work with a moderate level of noise. Work with occasional concentrated exposure to fumes, dusts, odors, gases, and poor ventilation.

---

² Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks she can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. *Id.* § 404.1520(e).

(AR 14).

Based on the assigned RFC and the VE's testimony, the ALJ found at step four that Sholl was unable to perform her past relevant work. (AR 18). At step five, the ALJ found that Sholl could perform a significant number of jobs in the economy, including counter clerk, usher, call out operator, and surveillance system monitor. (AR 19). Therefore, Sholl's application for DIB was denied. (AR 20).

*C. RFC*

Sholl argues that the ALJ failed to adequately account for her bilateral upper extremity limitations in reaching, handling, fingering, and feeling when assigning the RFC. Sholl's argument is persuasive in part, necessitating a remand of the ALJ's decision.

1. Applicable Law

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (bolded emphasis omitted). That is, the "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* at *1; *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545(a)(3). When determining the RFC, the ALJ must consider all medically determinable impairments, mental

5

and physical, even those that are non-severe. 20 C.F.R. § 404.1545(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

    2. <u>Relevant Medical History</u>

It is useful in this instance to begin with a review of Sholl's medical history pertaining to her upper extremities. In October 2018, Sholl saw an orthopedist for complaints of left shoulder pain, particularly with overhead activities and upon internal rotation. (AR 300). An MRI 18 months earlier had revealed a partial-thickness tear of the supraspinatus and infraspinatus muscles. (AR 300, 302). Sholl had tried injections and therapy, both of which provided just limited relief. (AR 302, 307). She also had undergone a carpal tunnel release on her right wrist in 2000 and on her left wrist in 2017. (AR 301). Upon clinical examination, Sholl demonstrated full active and passive motion in her left upper extremity but "pain at the extremes," and strength was 4+/5 in abduction and rotation.[3] (AR 302). She was diagnosed with left rotator cuff tendonitis/impingement with possible tear, and left acromioclavicular joint arthrosis. (AR 304). She was advised to undergo surgical repair, which she did several weeks later. (AR 294, 304). An EMG after the rotator cuff surgery, however, indicated a chronic C5-C6 radiculopathy. (AR 325).

In April 2019, Sholl was evaluated at the University of Michigan for continued shoulder pain exacerbated by increased use of her shoulder. (AR 314, 325). She felt she was at a "standstill" in physical therapy. (AR 325). She reported that if anything was in her left hand, she was unable to lift her left arm above her waist. (AR 325-26). She had weakness in her biceps and

---

[3] As to "4+/5," the first number reflects Sholl's actual strength, while the second reflects normal strength. *See Grades of Muscle Strength*, MERCK MANUAL, https://www.merckmanuals.com/professional/multimedia/table/grades-of-muscle-strength (last visited Oct. 13, 2022).

rotator cuff muscles and in wrist and elbow flexion, as well as numbness throughout her left upper extremity. (AR 316; *see* AR 325-36). An EMG was consistent with chronic left C5 and C6 radiculopathies. (AR 324).

In August 2019, Sholl was examined by Joshua Adkinson, M.D., of Plastic Surgery at Indiana University Health in Indianapolis, for left upper arm weakness and shoulder pain. (AR 342; *see* AR 414). She had marked atrophy of muscles about the left shoulder and generally 3/5 to 4/5 strength in her shoulder, but 5/5 strength in her wrist and digits. (AR 342-43). An MRI revealed a peripheral nerve sheath tumor associated with the left C5 nerve root/brachial plexus. (AR 412; *see also* AR 342, 388, 407). Dr. Adkinson explained that if the mass was excised she would lose most of her left shoulder and biceps function. (AR 343).

In September 2019, a neurosurgeon at Indiana University Health performed a partial excision of Sholl's C5 nerve sheath tumor, after which he referred her to physical therapy and a physical medicine and rehabilitation doctor. (AR 409, 414). He also asked that she return to Dr. Adkinson "to make plans for possible secondary re-animation of the left arm." (AR 414).

In December 2019, Sholl saw Dr. Adkinson for a significant decrease in her ability to elevate her left arm and ongoing pain in her shoulder. (AR 431). Dr. Adkinson discussed that Sholl's options for treatment were surgical nerve or muscle transfers. (AR 432).

In February 2020, Sholl underwent a nerve transfer surgery performed by Dr. Adkinson, followed by more therapy. (*See* AR 432, 528, 739-42). Upon discharge from physical therapy in July 2020, Sholl was "happy with how her function [was] improving," and she could complete all of her activities of daily living and ride her horse "with modifications." (AR 528). She still, however, had a "[s]evere [l]imitation" in reaching the top shelf of a refrigerator. (*Id.*). Her active range of motion in her left shoulder was 77 degrees flexion (165 degrees on the right), 45

7

degrees abduction (165 degrees on the right), and her strength on the left was 2+/5 shoulder flexion, 2+/5 abduction, 4-/5 external rotation, 4-/5 supination, and 4+/5 biceps brachii. (AR 528-29). She had 60 pounds of grip strength bilaterally. (AR 529). She reported that her pain management doctor had prescribed vicodin and instructed her to think about whether she would like to do injections, a spinal nerve stimulator, or to continue with medication for pain management. (AR 528).

In July 2020, Sholl underwent a "disability physical" by Abdali Shakoor Jan, M.D. (AR 505). She had 5/5 grip strength bilaterally and could perform fine and gross movements on a sustained basis. (AR 509). She had 4/5 strength in her left upper extremity and 5/5 in her right upper extremity. (*Id.*). Her left upper extremity range of motion was limited in that she demonstrated 70/150 degrees abduction, 20/30 degrees adduction, 65/150 degrees forward elevation, 50/80 degrees internal rotation, 60/90 degrees external rotation, and 80/150 degrees elbow flexion.[4] (AR 510). Atrophy and deformity of the shoulder were apparent. (AR 509). She could perform her activities of daily living with modifications and with some difficulty. (AR 505). Dr. Jan concluded that Sholl could "carry twenty pounds short distances, just not over her head . . . . [and] can lift ten pounds over [her] head using the right arm only." (AR 509).

In August 2020, Dr. Adkinson and his resident evaluated Sholl and indicated that she had reached a plateau in functional gains of her left upper extremity, and that her pain management doctor had recommended a spinal cord stimulator for pain control. (AR 743-44). Sholl had experienced some left upper extremity swelling periodically in the past two months. (*Id.*). Dr.

---

[4] The first number reflects Sholl's actual range of motion in degrees, while the second number reflects the standard for normal range of motion. (*See* AR 510).

Adkinson also discussed the possibility of Sholl undergoing a Steindler flexorplasty in the future if she wanted to improve her left elbow flexion. (AR 744).

In January 2021, Sholl returned to Dr. Adkinson and his nurse practitioner, who noted that Sholl continued to see a pain management doctor for her shoulder pain. (AR 745). Sholl reported right shoulder pain from overuse, that she was pursuing a spinal cord stimulator for pain, and that she was learning to make adaptions to perform her activities of daily living. (*Id.*). She had reduced range of motion and strength in her left shoulder and reduced elbow function, "very limited shoulder function," and had "hit a plateau in functional gains that will likely be her new baseline." (AR 745-46). She had 45 degrees left shoulder rotation, 15 degrees abduction, decreased external rotation, and no internal rotation. (*Id.*).

In March 2021, Sholl underwent implantation of a trial spinal cord stimulator for pain management. (AR 664). After implantation, Sholl rated her pain as a "one" on a ten-point pain scale, estimating that the stimulator was providing 60% to 70% pain relief. (AR 660). She had decreased her need for medications. (*Id.*). She was able to perform her activities of daily living with less pain and at a faster pace. (*Id.*). In April 2021, Sholl underwent implantation of a permanent spinal cord stimulator. (AR 755).

### 3. The Medical Source Opinions of Record

In May 2020, Dr. Adkinson indicated (via a note written by his resident) that Sholl was unable to return to work at that time. (AR 742). The ALJ found this opinion "minimally persuasive" given that Dr. Adkinson told Sholl that she would "likely begin to see more improvements in the coming months." (AR 18 (quoting AR 742)). The ALJ also noted that "whether or not a claimant is disabled or unable to work is an issue reserved to the

Commissioner." (*Id.* (citing 20 C.F.R. § 404.1527(d))).

In July 2020, J.V. Corcoran, M.D., a state agency physician, reviewed the record and concluded that Sholl could lift 10 pounds frequently and 20 pounds occasionally, could reach overhead with her right arm just occasionally, and could climb ladders, ropes, and scaffolds occasionally. (AR 63-65). The ALJ found this opinion "somewhat persuasive," but noted that the limitation with respect to Sholl's right arm was not consistent with her reduced left upper extremity functioning. (AR 17).

As stated earlier, Sholl saw Dr. Jan for a "disability physical" in July 2020. (AR 505). Dr. Jan concluded, in relevant part: "[Sholl] has normal fine motor skills with normal handling of objects . . . . [S]he can carry twenty pounds short distances, just not over her head. **[S]he can lift ten pounds over [her] head using the right arm only**." (AR 509). The ALJ found Dr. Jan's opinion "somewhat persuasive," stating that it "is generally supported by the overall record, which shows the ability to perform light work with reduced reaching and use of the left arm." (AR 18).

In September 2020, a second state agency physician, Mangala Hasanadka, M.D., reviewed Sholl's record and issued the same opinion as Dr. Corcoran, except that Dr. Hasanadka limited Sholl to occasional reaching overhead with her left arm rather than her right. (AR 79-80). The ALJ found Dr. Hasanadka's opinion "consistent with the overall record." (AR 17).

In January 2021, Dr. Adkinson completed a physical capacities assessment on Sholl's behalf after evaluating her that same day, assigning her permanent work restrictions. (AR 644-46). He assessed that she could lift 10 pounds frequently, but never more than that with her left arm; could perform frequent handling; climb ladders or stairs occasionally; but never crawl or

10

reach with her left arm. (AR 644). She could not perform fine manipulation with her left hand on a repetitive basis. (AR 645). Dr. Adkinson opined: "[Sholl] has permanent decreased function to left arm, elbow and shoulder. Has decreased strength, function, and range of motion. Has very limited left shoulder mobility and decreased mobility of left elbow." (AR 646). He indicated that she was "totally disabled" as of October 30, 2018, and was not a suitable candidate for occupational rehabilitation. (AR 647). The ALJ found Dr. Adkinson's opinion "partially persuasive," stating: "This opinion is not fully supported by the record, which shows improvement in function with surgeries and physical therapy. It also does not take into account the claimant's implantation of a spinal cord stimulator in April 2021." (AR 17).

 4. Analysis

 Sholl contends that the ALJ failed to sufficiently account for her upper extremity limitations when assigning her an RFC to "never crawl, or climb ladders, ropes, or scaffolds," and just "occasionally reach in all directions with the left, non-dominant, upper extremity." (AR 14; *see* ECF 20 at 21). Sholl asserts that "[i]t defies logic that someone with [her] impairments would be able . . . to reach in all directions a full third of the day . . . . [a]nd to otherwise have no restrictions whatsoever on her left upper extremities—including no restrictions whatsoever as to handling, . . . fingering, and . . . feeling." (ECF 20 at 21). She also argues that given the more recent overuse symptoms she was experiencing in her right upper extremity, the ALJ erred by failing to assign any restrictions that relate to her right upper extremity. (*Id.* at 21, 24). Ultimately, given Sholl's medical history and the medical source opinions summarized above, Sholl's argument is persuasive, at least in part.

 As articulated above, the ALJ seemingly assigned the most weight to the opinion of Dr.

11

Jan, who reviewed Sholl's record in November 2020 and limited her to occasionally climbing ladders, ropes, or scaffolds, and occasionally reaching overhead with her left arm. (AR 17). In doing so, the ALJ stated that Dr. Jan's opinion was "consistent with the overall record." (*Id.*). The ALJ elaborated further as to her reasoning when assigning the RFC:

> Limiting the claimant to light work with reduced postural limitations is consistent with surgeries of the left upper extremity and an abnormal EMG but improvement in functioning with physical therapy and a reduction in pain and medication use with a spinal cord stimulator. Reduced reaching with the left upper extremity does the same.

(AR 18).

The ALJ's reasoning when assigning the RFC, however, is not supported by substantial evidence with respect to Sholl's ability to reach *overhead* with her left arm. The evidence of record from her treating and examining sources consistently show that Sholl was unable to reach overhead with her left arm—even occasionally—after her various surgeries and therapies, and that she had to modify her activities of daily living and leisure interests to account for such loss of ability. For example, when Sholl was discharged from physical therapy in July 2020, the report reflects that she was "able to complete all [activities of daily living] and ride her horse *with modifications*." (AR 528 (emphasis added); *see also* AR 529, 535, 539). The record reflects that at that time Sholl still had a "[s]evere [l]imitation" in reaching the top shelf of a refrigerator. (AR 528; *see also* AR 510, 535). Her active range of motion of the left shoulder was 77 degrees flexion and 45 degrees abduction, while her active range of motion of the right shoulder was 165 degrees flexion and 165 degrees abduction. (AR 528; *see also* AR 510). Her left upper extremity strength was 2+/5 shoulder flexion, 2+/5 abduction, 4-/5 external rotation, 4-/5 supination, and 4+/5 biceps brachii. (AR 529).

Similarly, Dr. Adkinson documented in January 2021 that Sholl had 45 degrees left shoulder rotation, 15 degrees abduction, "decreased elbow function," and "very limited shoulder function," stating that she had "hit a plateau in functional gains that will likely be her new baseline." (AR 745-46). Sholl was "learning to make adaptions" and was able to perform her activities of daily living. (*Id.*; *see also* AR 505).

The Commissioner has not pointed to any evidence of record, nor has the Court observed any, indicating that Sholl's left shoulder range of motion improved after her surgeries to where she could perform overhead activities with her left arm. Rather, the record consistently reflects that Sholl had to learn to modify *how* she performs her activities due to her inability to reach overhead with her left upper extremity—a point that the ALJ seemingly failed to appreciate when assigning the RFC.

Sholl specifically takes issue with the ALJ's citation to a June 5, 2020, treatment note, and the ALJ's resulting inference that Sholl "was going to barrel race that weekend despite her testimony she was no longer able to do this activity." (ECF 20 at 22 (citing AR 16); *see* AR 44-45, 534). Sholl claims that the ALJ's inference that she was "lying" is unjustified (ECF 20 at 22), given that the treatment note actually said "Has barrel racing this weekend." (AR 534). Sholl contends there is no evidence that she actually did perform barrel racing. (ECF 20 at 22). This argument strikes the Court as a nitpick of the ALJ's decision. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (stating that the court will "give the opinion a commonsensical reading rather than nitpicking at it" (citation omitted)). Having said that, there is no evidence that Sholl's purported return to barrel racing *with modifications* required her to reach overhead with her left arm.

13

Nor does the fact that Sholl made some improvement in her left arm over time as the ALJ noted—to where she told Dr. Adkinson in August 2020 that she was "content with [the] result"—mean that she regained the ability to reach overhead with her left arm. (AR 17 (citing AR 744 ("Overall improved from prior, content with result."))). Rather, Dr. Adkinson actually wrote this comment when indicating that Sholl had reached a "[p]lateau in functional gains" with 60 degrees left shoulder abduction and minimal external rotation. (AR 743-44). Thus, that Sholl experienced some improvement in her left upper extremity functionality after her nerve transfer surgery does not necessarily mean that she regained the ability to reach overhead with her left arm. *See Meuser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016) ("[T]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." (citation omitted)); *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work.").

The ALJ also discounted Dr. Adkinson's January 2021 opinion about Sholl's limitations because it "does not take into account the claimant's implantation of a spinal cord stimulator in April 2021." (AR 17). But the spinal cord stimulator was to assist Sholl with pain management by reducing her reliance on medications. (*See* AR 743, 745). Indeed, Sholl did report that the spinal cord stimulator helped her to perform her daily activities with "less pain" and "quicker than her normal pace." (AR 660). But the Commissioner has not cited any evidence of record, nor has the Court noted any in its own review, that indicates the spinal cord stimulator helped to improve Sholl's range of motion such that she was able to regain her ability to reach overhead with her left upper extremity.

14

Finally, while the ALJ assigned an RFC consistent with the opinion of Dr. Hasanadka, the state agency physician who reviewed her record in September 2020 (*see* 79-80), Dr. Hasanadka did not have the opportunity to review Dr. Adkinson's January 2021 medical source statement assigning Sholl "permanent" restrictions of her left upper extremity (AR 646; *see also* AR 647). Had Dr. Hasanadka reviewed that medical source statement, it "could have changed [his] medical opinion[]." *Carlota R.M. v. Saul*, No. 18-cv-2873, 2019 WL 3410222, at *7 (N.D. Ill. July 29, 2019); *see, e.g.*, *Hoskins v. Berryhill*, No. 1:18cv23, 2018 WL 5262939, at *4 (N.D. Ind. Oct. 23, 2018) (remanding the ALJ's decision to reconsider the claimant's problems with handling and fingering and the weight assigned to the medical source opinions post-dating those of the reviewing state agency doctors).

In sum, Sholl's argument that the ALJ failed to adequately account for her upper extremity limitations has merit, at least in part.[5] The record reflects that Sholl's left upper extremity function did improve over time, but she still had some permanent restriction in reaching overhead with her left arm, resulting in her performing daily activities and leisure interests *with modifications*. The Commissioner has failed to cite evidence indicating that Sholl's left shoulder limitations improved after her surgeries such that she could reach overhead with her left arm to perform overhead activities—even occasionally. While the ALJ assigned an RFC that attempts to account for how often Sholl could reach with her left upper extremity, it overlooks

---

[5] Because a remand is necessary to consider Sholl's restrictions in reaching overhead with her left upper extremity, the Court need not reach her associated arguments that the ALJ failed to adequately account for her limitations in handling, fingering and feeling with her left hand or her symptoms arising from overuse of her right upper extremity.

15

her inability to reach *overhead* with her left upper extremity.[6] Accordingly, the ALJ's decision will be remanded to the Commissioner for further consideration of the medical source opinions and evidence pertaining to Sholl's upper extremity limitations and the resulting RFC.[7]

While Sholl asks that the Court reverse the Commissioner's decision and remand for an outright award of benefits (ECF 20 at 26), "an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (citations omitted); *see also Bray v. Astrue*, No. 2:10-CV-00352, 2011 WL 3608573, at *10 (N.D. Ind. Aug. 15, 2011). The record here does not "yield but one supportable conclusion" in Sholl's favor. *Briscoe ex rel. Taylor*, 425 F.3d at 355 (citation omitted). Rather, the ALJ failed to properly consider important medical evidence when considering the medical source opinions and assigning the RFC. This issue can only be resolved through further proceedings on remand. *See Bray*, 2011 WL 3608573, at *10.

### IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is

---

[6] The Commissioner also suggests that the jobs cited by the VE require no more than occasional reaching with *either* extremity, not bilateral reaching, such that Sholl could still perform the jobs with her right upper extremity even if she could not do so with her left. (ECF 22 at 16). But that is not a basis cited by the ALJ or VE, and thus, it is a post-hoc argument advanced by the Commissioner's lawyers. *See Hunt v. Astrue*, 889 F. Supp. 2d 1129, 1133 (E.D. Wis. 2012) ("[T]he court's review is confined to the rationales offered by the ALJ; it may not affirm based on post-hoc justifications provided by the Commissioner's lawyers." (internal citations omitted)). In any event, this Court declines to delve into whether the jobs cited by the ALJ requiring occasional "reaching" with the left upper extremity include reaching above shoulder level with one or both upper extremities under the Dictionary of Occupational Titles (DOT). *See, e.g.*, *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) ("It is not clear to [the Court] whether the DOT's requirements include reaching above shoulder level, and this is exactly the sort of inconsistency the ALJ should have resolved with the expert's help."); *Roxanne R. v. Berryhill*, No. 18 C 5484, 2019 WL 2502033, at *6 (N.D. Ill. June 17, 2019) ("[I]t is unclear whether the DOT's requirements of frequent reaching for the housekeeper/ cleaner position includes bilateral reaching, which is precluded by Plaintiff's RFC at the frequency listed in the DOT.").

[7] Because a remand is necessary to consider Sholl's restrictions in reaching overhead with her left upper extremity, the Court need not reach Sholl's argument challenging the number of jobs cited by the ALJ at step five.

16

REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The clerk is directed to enter a judgment in favor of Sholl and against the Commissioner.

SO ORDERED.

Entered this 7th day of December 2022.

/s/ Susan Collins  
Susan Collins  
United States Magistrate Judge